IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **ANITA TATUM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.: 2:07-cv-609-ID** |
| | ) | |
| **NANCY WORLEY, in her individual** | ) | |
| **capacity and BETH CHAPMAN in** | ) | |
| **her Official Capacity as Alabama** | ) | |
| **Secretary of State and in her** | ) | |
| **individual capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION TO REMAND AND MOTION FOR LEAVE TO AMEND COMPLAINT

**Nancy Worley** and **Beth Chapman** ("Defendants") submit this opposition to Plaintiff's Motion to Remand and Motion for Leave to Amend Complaint as follows:

### INTRODUCTION

On October 19, 2004, Plaintiff, Anita Tatum, resigned from her job as Supervisor of Voter Registration with the State of Alabama. (Complaint (Compl.) at ¶ 2). The Plaintiff appealed her termination to the State Personnel Board. (Compl. at ¶ 2). In order to give the Court a flavor of the extensive procedural history of this case, Defendants attach as Exhibit "A" to this opposition motion the recommended Order of the Administrative Law Judge appointed by the State Personnel Board to hear Tatum's appeal. When Tatum first filed her appeal to the State Personnel Board, she alleged that her resignation resulted

from a constructive discharge. (Recommended Order at 4). Tatum also alleged that she suffered from an FMLA qualifying medical issue which caused her to have panic attacks. Id. at 5. The State Personnel Board placed Tatum on notice that Ala. Admin. Code § 670-X-18-.02, does not provide jurisdiction for constructive discharge actions or resignations. Id. at 6. However, while no jurisdiction existed based upon a resignation, the Director explained to Tatum's counsel that the Alabama Administrative Code prohibits other types of discrimination, such as political discrimination under Ala. Admin. Code § 670-X-4-.03. Because Tatum alluded to such a potential issue, yet failed to plead adequately, the State Personnel Board gave Tatum a second opportunity to clarify her appeal in the event she intended to pursue an appeal for some form of unlawful discrimination. Id. at 6.

Counsel for Anita Tatum then filed a second letter stating only that Tatum intended to pursue an appeal on the basis of political discrimination. Id. at 6. However, Tatum's counsel plead no facts supporting the claim. Id. at 6. Rather, in the second letter dated December 23, 2004, counsel for Tatum made only a conclusory allegation of retaliation and discrimination by the Secretary of State. Id. at 6. The Administrative Law Judge then granted Tatum a third opportunity to clarify the factual basis of her appeal. Tatum failed to submit any such clarification. Id. at 7. The Administrative Law Judge then issued an Order providing Tatum a fourth opportunity to clarify her appeal. The Order provided in pertinent part:

> A status conference was held on February 2, 2005. Trey Grainger, Esq. appeared for the Secretary of State and Norbert Williams, Esq. appeared for the employee. The employee has appealed her termination, however, of this date she has failed to properly state a claim upon which relief can be granted. Per Rule 670-X-4-.03. In order for jurisdiction to exist, the rule requires some demonstrative showing of discrimination to race, sex, national origin, age, handicap, political or religious affiliation. The employee has until

Monday, February 7, 2005 to clarify her claim . . .

Id. at 7.  Tatum purported to clarify her claim by alleging political discrimination and making

vague references to violation of the Family Medical Leave Act.      Id. at 7-9. The

Administrative Law Judge held that this clarification still failed to state a claim under

Alabama law but held that Tatum had stated a claim for unlawful discrimination based upon

other "non-merit factors." Id.  The Administrative Law Judge then proceeded to hold a

three-day hearing. (Compl. at ¶ 40).  Following this hearing, the Administrative Law Judge

determined that as a matter of law, Tatum's resignation was a voluntary action and that

accordingly there was no "adverse employment action" as a matter of law. Id. at 51.  Thus,

the Administrative Law Judge concluded there was no jurisdiction over the appeal.  Even

assuming that Tatum established an adverse employment action, the Administrative Law

Judge determined that the Secretary of State's acts did not constitute an unlawful form of

non-merit factor discrimination. Id. at 51-55.  The Administrative Law Judge recommended

that the appeal be dismissed with prejudice. Id.

     The State Personnel Board, after a hearing, then dismissed Tatum's appeal on the

basis that the State Personnel Board had no jurisdiction to hear the appeal. (Compl. at ¶

40).  Plaintiff began the process to appeal the dismissal to the Circuit Court of Montgomery

County by filing a Notice of Appeal but failed to take all steps necessary to perfect that

appeal.  (See Notice of Appeal attached hereto as Exhibit "B").  More than thirty days after

her appeal had been dismissed, Tatum filed this independent lawsuit in the Circuit Court

of Montgomery County, Alabama.   Plaintiff's lawsuit makes broad allegations of "due

process violations."  Defendants removed the Complaint based upon those allegations.

Plaintiff has filed her Motion to Remand along with a Motion for Leave to File Amended

Complaint contending now that she is only asserting a claim under the Alabama Constitution. Plaintiff's Motions are due to be denied because the case was properly removable in the first instance and Plaintiff should not now be allowed to manipulate the pleadings to avoid federal jurisdiction.

## ARGUMENT

## A.    DEFENDANTS' REMOVAL WAS APPROPRIATE SINCE PLAINTIFF ALLEGED A DUE PROCESS VIOLATION

The presence or absence of federal court jurisdiction is governed by the well pleaded complaint rule which provides that federal jurisdiction exists only when a "federal question is presented on the face of the plaintiff's properly pleaded complaint." Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987) (citations omitted). The district court must determine whether it had subject matter jurisdiction at the time of removal. Poore v. American-Amicable Life Ins. Co. of Texas, 218 F. 3d 1287, 1291 (11th Cir. 2000); Howard Griggs Trucking, Inc. v. American Ins. Co., 894 F. Supp. 1503, 1507 (M.D. Ala.1995) ("the propriety of removal should be considered based upon the pleadings as of the date of removal.") (citing Cabalceta v. Standard Fruit Co., 883 F. 2d 1553, 1561 (11th Cir. 1989)); see also Bailey v. Wal-Mart Stores, 981 F. Supp. 1415, 1416 (N.D. Ala.1997) (holding that the right to remove should be determined as of the date of removal in both diversity and federal question cases). Plaintiff's Complaint in Counts III and VIII, specifically makes allegations regarding alleged violations of her "constitutionally protected interest in continued employment" and claiming that her alleged discharge triggers the "protections of the due process clause." (See Compl. at ¶¶ 46, 56). Plaintiff seeks, in her prayer for relief, a declaration that "[D]efendant Worley violated Plaintiff Tatum's constitutionally

protected interest in continued employment without due process of law." (See Plaintiff's *ad damnum* clause). As a result, Defendants properly removed this case to federal court because at the time of removal, Plaintiff was seeking a declaration of her due process rights.

**B.   PLAINTIFF SHOULD NOT BE ALLOWED TO USE MANIPULATIVE TACTICS TO AVOID FEDERAL JURISDICTION**

Plaintiff seeks to amend her Complaint to "clarify" that she is not seeking damages for Defendants' alleged violation of the due process clause of the U.S. Constitution. (Doc. 5 at ¶ 4). It is based upon this purported clarification that Plaintiff seeks a remand of this case to the Circuit Court of Montgomery County.   (Doc. 6 at ¶ 5).   Generally, a case properly removed to federal court may not be made automatically subject to remand by simply allowing the plaintiff to amend the Complaint to strike off federal claims.   Brock v. DeBray, 869 F. Supp. 926, 928 (M.D. Ala. 1994). In Carnegie Mellon Univ. v. Cohill, 484 U.S. 343, the Court held that a district court has discretion to remand a case where the federal claims have been deleted by weighing considerations of "economy, convenience, fairness and comity." Id at 350. However, the Court also held that plaintiff's use of "manipulative tactics" to secure a state forum in which to try the case is a factor a district court can consider when deciding whether to remand the case where the plaintiff has dismissed any reference to federal claims.

In the instant case, Tatum could have perfected her administrative appeal so as not to implicate a federal question. The cases of  Ruffin v. Citifinancial, 2005 WL 1388059 (S.D.Ala. 2005) and Lambert v. Gates County, 2001 WL 34556317 (E.D.N.C. 2001) are

instructive.[1] In Ruffin, the plaintiff sued Citifinancial in Circuit Court but failed to specify the amount of damages. Citifinancial removed the case to federal court invoking the court's diversity jurisdiction. The plaintiff then clarified her allegations to assert that she was seeking less than $75,000. Based upon this clarification, the Court remanded the case. Upon remand, the Plaintiff added a claim against Citifinancial for violation of the Fair Credit Reporting Act. Citifinancial again removed the case. Ruffin attempted to dismiss the federal claim and again asked the court to remand the case. The Court stated:

> In this action, it is apparent that Plaintiff is, indeed, attempting to manipulate the forum. Ruffin crafted her original complaint so as to avoid federal court and it is expressly noted that there is nothing wrong with that. However, when the federal claim was added, Plaintiff ran the risk of this action being removed. It was a risk that should not have been taken if Ruffin wanted to maintain her action in the State courts. This Court is not going to enable Plaintiff's desire by allowing the dismissal of her federal claim. Id at *2

Similarly, in Lambert, the plaintiff filed a civil rights suit pursuant to 42 U.S.C. §1983 in state court. Following removal, the Plaintiff sought to amend the Complaint to dismiss the federal claim. The court rejected Plaintiff's attempt to remand on the basis that remand was "outweighed by the Court's interest in preventing forum shopping by plaintiffs." Lambert at *2.

In the instant case, after the State Personnel Board dismissed her appeal on April 18, 20007, Plaintiff filed a Notice of Appeal of the decision of the State Personnel Board to the Circuit Court of Montgomery, pursuant to ALA. CODE § 41-22-20. (See Notice of Appeal attached hereto as Exhibit "B"). The appeal in that case would have been limited

---

[1] But see *contra* Brock v. DeBray, 869 F. Supp. 926, 928 (M.D. Ala. 1994) (remanding case after plaintiff dismissed federal claims but recognizing that court has discretion to refuse remand under circumstances outlined herein).

to a review of the record before the State Personnel Board. See ALA. CODE § 41-22-20 (I). The circuit court would review the case without a jury.    See ALA. CODE § 41-22-20 (j). However, Plaintiff failed to take the steps necessary to perfect that appeal. In order to perfect the appeal, Plaintiff was required to file a petition for review naming the State Personnel Board as a respondent within thirty days of filing her appeal. See ALA. CODE § 41-22-20(h). By failing to file a petition for review with the Circuit Court of Montgomery County within thirty days of filing the Notice of Appeal, Tatum abandoned her appeal. Tatum then filed this lawsuit instead on May 30, 2007 containing allegations of due process violations and seeking a trial by jury. Now, after Defendants have removed this case to federal court, Plaintiff conveniently seeks to claim that she never intended to assert any sort of federal claim.

Tatum was guaranteed a state forum by pursuing her appeal pursuant to Ala. Code § 41-22-20. Tatum inexplicably chose instead to file this suit. As the Court did in Ruffin and Lambert, Defendants urge the Court to reject Plaintiff's attempt to manipulate the legal process and to engage in forum shopping by denying Plaintiff's motion to remand.

## C.    CONSIDERATIONS OF CONVENIENCE AND JUDICIAL ECONOMY WEIGH AGAINST REMANDING THIS CASE

In this case, there are a number of obvious legal defenses to Plaintiff's claims that should be immediately dispositive of Plaintiff's case. Upon resolution of this Motion to Remand, Defendants anticipate moving for a judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c). First and foremost, and as noted previously, Plaintiff may not maintain an independent lawsuit for damages after failing to perfect her appeal once instituted pursuant to ALA. CODE § 41-22-20. See Ala. State Pers. Bd. v. Brashears, 575 So. 2d

1149, 1150-51 (Ala. Civ. App. 1991) (holding that Court had no jurisdiction to hear separate declaratory judgment action filed after plaintiff elected to appeal under ALA. CODE § 41-22-20); Ex parte Smith, 683 So. 2d 431 (Ala. 1996) (holding that failure to avail oneself of appeal pursuant to ALA. CODE § 41-22-20 constituted a waiver of an independent lawsuit for damages for wrongful termination). Second, Plaintiff's claims are barred by the applicable two-year statute of limitations. See Rester v. McWane, Inc., No. 1050787, 2007 WL 80826, at *2 (Ala. Jan. 12, 2007) (holding that claims for wrongful discharge, intentional infliction of emotional distress and an allegation of discharge in "violation of public policy" were subject to two-year statute of limitations); See also City of Gadsden v. Harbin, 398 So. 2d 707 (Ala. Civ. App. 1981)(holding that former section providing for one year statute of limitation was applicable to Plaintiff's claim for allege wrongful discharge from city for failure to provide pre-termination hearing); Lester v. Twitchell, a Div. of Ludlow, Inc., 894 F. Supp. 1511 (M.D. Ala. 1995) (holding that Section 1981 claim is subject to Alabama's two-year personal injury statute) (abrogated on other grounds); Lufkin v. McCallum, 956 F. 2d 1104 (11th Cir. 1992) (holding that Alabama's two-year statute of limitations was applicable to Section 1983 employment due process claim). Finally, Plaintiff's claims are barred by governmental immunity. Ex parte Cranman, 792 So. 2d 392, 405 (Ala. 2000).

## CONCLUSION

Plaintiff's Motion to Remand and Motion to Amend Complaint are due to be denied. The case was properly removable in the first instance. Plaintiff's Motion for Leave to Amend Complaint and Motion to Remand are simply manipulative tactics to evade federal jurisdiction as set forth herein. Considerations of these manipulative tactics, judicial

economy and convenience of the parties weigh heavily in favor of denying Plaintiff's Motion to Remand and Motion to Amend her Complaint.  As a result, Defendants urge the Court to deny Plaintiff's Motion to Remand and Motion for Leave to Amend Complaint.

WHEREFORE, the premises considered, Defendants respectfully request that Defendants deny Plaintiff's Motion to Remand and Motion to Amend Complaint.

Respectfully submitted,

s/ John M. Bolton, III
John M. Bolton, III
Bar Number: ASB-0999-N68J
Patrick L. W. Sefton
Bar Number:  ASB-8341-N47P
Charlanna W. Spencer
Bar Number:  ASB-6860-R62C
Attorneys for Defendants
Sasser, Bolton & Sefton, P.C.
P. O. Box 242127
Montgomery, AL 36124-2127
Telephone: (334) 532.3400
Facsimile:  (334) 532.3434
Email: jbolton@sasserlawfirm.com
      psefton@sasserlawfirm.com
      cspencer@sasserlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO REMAND AND MOTION FOR LEAVE TO AMEND COMPLAINT** has been e-filed using the CM/ECF system and served upon the following via United States Postal Service, with proper postage prepaid, on this the 23rd day of August 2007:

Norbert H. Williams, Esq.
Alabama State Employees Association
110 N. Jackson Street
Montgomery, AL 36104

<u>s/ John M. Bolton, III</u>
John M. Bolton, III
Sasser, Bolton & Sefton, P.C.
P. O. Box 242127
Montgomery, AL 36124-2127
Telephone: (334) 532.3400
Facsimile:   (334) 532.3434
Email: jbolton@sasserlawfirm.com
Bar Number: ASB-0999-N68J

**EXHIBIT "A"**

## BEFORE THE STATE PERSONNEL BOARD
## IN THE MATTER OF

ANITA TATUM,                                    )
                                                )
        Appellant,                              )
                                                )  Case No. 05-002-JJW
v.                                              )
                                                )
ALABAMA SECRETARY OF STATE,                     )
                                                )
        Appellee.                               )

## RECOMMENDED ORDER TO THE STATE PERSONNEL BOARD

The undersigned began conducting this hearing on November 14, 15 and 16, 2005. Although the parties previously represented the hearing would only require two days, at the close of the third day, the parties represented an additional two days would be required to complete this matter. Despite the efforts of the undersigned to resume the hearing in December, 2005, the earliest date given by the Employee's counsel to resume the hearing was May 10 - 11, 2006. (Discussed infra). However, on May 9, 2006, the parties notified the undersigned that they had agreed to submit affidavits and briefs in lieu of resuming live testimony. These affidavits and briefs were submitted in June, 2006. The parties also submitted a three volume 965 page transcript and numerous exhibits.

The undersigned conducted the hearing at the State Personnel Board Room

1

in Montgomery, Alabama. John Bolton, Esq. and Charlanna W. Spencer, Esq. appeared as counsel on behalf of the Alabama Secretary of State's Office. Norbert Williams, Esq. appeared on behalf of the Employee, Anita Tatum.

The Department introduced 46 exhibits consecutively numbered as 1-46.[1] The Employee introduced 3 exhibits marked as Employee Exhibits 6, 7, and 8.[2]

The following individuals offered testimony by affidavit or at the hearing:

(1)    Nancy Worley: former Secretary of State;

(2)    Trey Granger: former Legal Counsel to Secretary of State, Nancy Worley;

(3)    Anita Tatum: the Employee;

(4)    Tracy Cleckler: an employee in the IT division of the Secretary of State's Office;

(5)    Robert White: Interim Director of Voter Registration in the Secretary of State's Office;

---

[1]    **Due to the sensitive nature of the exhibits and the privacy protected material involved, all exhibits are hereby placed UNDER SEAL and are not available for public inspection** absent an order from the court, the appropriate hearing officer or an order from the State Personnel Board.

[2]    The Employee did not identify any exhibits as required by the scheduling order. At the hearing, the Employee attempted to introduce 5 exhibits. The Employee had not identified these exhibits to opposing counsel prior to the morning of the hearing. Although the exhibits were precluded for failure to comply with the scheduling order, the undersigned did allow the Employee to argue and question witnesses with regard to matters contained in her personnel file. Tatum's counsel indicated he would largely rely on the personnel file, rather than offering exhibits 1-5 into evidence. Both parties and the undersigned had a copy of Tatum's personnel file--most of Employee exhibits 1-5 originated from her personnel file. Tatum was also permitted to introduce any exhibit for rebuttal purposes.

(6)     Linda Nelson: Director of Personnel for the Secretary of State's
        Office;

(7)     Sheldon Jeames: Finance Division in Secretary of State's Office;

(8)     Ed Packard: Administrator of Elections at the Secretary of State's
        Office;

(9)     Robert White: Interim Supervisor of Voter Registration with the
        Secretary of State (also testifying by affidavit);

(10)    Mary Harris: Circuit Court of Shelby County (testifying by affidavit);
        and

(11)    Vicki Balogh: Tatum's former supervisor at the Secretary of State's
        Office.[3]

## I. PROCEDURAL HISTORY AND CHARGES

Because of the length of time necessary for the Employee to properly plead
a claim: the large number of requests for continuances and requests for extensions
of time by the parties, a detailed procedural history is set forth as follows:

Anita Tatum (hereinafter "Tatum" or "the Employee") began work with the
Secretary of State's Office in 2003. Prior to 2003, Tatum was employed in the

---

[3] Employee's counsel referred to the testimony of Vicki Balogh, which was apparently contained in an affidavit. However, said affidavit was never submitted. The undersigned considered the counselor's arguments regarding Balogh's alleged testimony.

3

Office of Voter Registration, a separate state agency. The State of Alabama

employed Tatum for more than 21 years in the Office of Voter Registration where

she served as the Director for more than 15 years. As a result of State and Federal

Legislation, the Office of Voter Registration was merged into the Alabama

Secretary of State's Office in 2003. The enactment of that legislation transferred

Tatum's position as the Director of Voter Registration to become the Supervisor of

Voter Registration within the Secretary of State's Office. The transfer occurred

approximately seven months after Alabama citizens elected Nancy Worley

(hereinafter "Secretary Worley", "Worley" or "the Secretary") as their Secretary of

State and her assumption of the office.

The Employee resigned her position with the Secretary of State on or about

October 19, 2004. Thereafter, she appealed to the Alabama State Personnel

Board on or about October 29, 2004. As hereinafter discussed, however, Tatum

initially failed to state a claim which provided the State Personnel Board with

jurisdiction or that stated a claim upon which relief could be granted.

Generally, well settled Alabama law provides that the State Personnel Board

possesses no jurisdiction to hear employee cases resulting from a resignation or

constructive discharge. Initially, Tatum alleged that her resignation resulted from

a constructive discharge. She also alleged she suffered from an FMLA-qualifying

4

medical issue which caused her to have panic attacks.[4]

In Tatum's initial appeal, she contended that on the afternoon of Tuesday, October 19, 2004, Secretary Worley summoned Tatum to her office. In a threatening and demeaning manner, Worley ordered Tatum to correct an alleged error in the number of registered voters maintained by the Secretary of State's database. Specifically, an apparent discrepancy existed between the voter registration numbers on the Secretary of State's website and the number of registered voters in the Secretary of State's database. Worley requested an explanation of the discrepancy by 5:00 p.m. Tatum contends she attempted to explain the problem, but lacked the expertise to address the matter. Tatum returned to Worley's office at approximately 5:00 p.m. to request additional time. Tatum contends that because her answers were unsatisfactory, Worley gave her the choice to resign or face dismissal proceedings. As a result, Tatum resigned. Tatum initially appealed pursuant to *Ala. Admin. Code* § 670-X-18-.02, a provision which only provides jurisdiction for dismissal appeals, not resignations.

*Alabama Admin. Code* § 670-X-18-.02 does not provide jurisdiction for

---

[4] However, Tatum later admitted at the hearing that on the day of her resignation, she had not suffered from a panic attack. Transcript, Volume II, page 115.

constructive discharge actions or resignations.[5]  However, while no jurisdiction

existed based upon a dismissal, the Director explained to Tatum's counsel that the

Alabama Administrative Code prohibits other types of discrimination, such as

political discrimination under *Ala. Admin. Code* § 670-X-4-.03.  Because Tatum

alluded to such a potential issue, yet failed to plead it adequately, the Director

gave Tatum a second opportunity to clarify her appeal in the event she intended to

pursue an appeal for some form of unlawful discrimination.

Counsel for Anita Tatum then filed a second letter, stating only that Tatum

intended to pursue an appeal on the basis of political discrimination. However,

Tatum's counsel plead no facts supporting the claim.  Rather, in this second letter

dated December 23, 2004, counsel for Tatum, made only a conclusory allegation

of retaliation and discrimination by the Secretary of State.

In January 2005, the Director assigned the  matter to the undersigned

Administrative Law Judge for resolution.  The undersigned granted Tatum a third

---

[5]  *See* the letter from the Director of State Personnel, Thomas Flowers to Norbert Williams, Esq.  Also, the Alabama Supreme Court has held that the Personnel Board's policies and procedures do not give an employee who resigns the right to a hearing.  The Personnel Board's interpretation of its own regulation is entitled to "substantial deference." *Mobile County Pers. Board v. Tillman*, 751 So. 2d 517, 518 (Ala. App. 1999).  That interpretation must stand if it is reasonable, even though it may not appear as reasonable as some other interpretation. *Ex parte Bd. Of School Comm'rs of Mobile County*, 824 So. 2d 759, 751 (Ala. 2001).  The Personnel Board's Interpretation of its own policies "is controlling unless plainly erroneous." *Id.*

The Personnel Board's interpretation of its own jurisdiction is not plainly erroneous.  Section 36-26-27, Code of Alabama (1991), addresses the issues of "dismissal" and "notice of discharge."  The Personnel Board's Rules address "dismissed employees" and circumstances surrounding "removal" and those Rules define dismissals and resignations differently.  The Personnel Board's manual gives a dismissed Employee the right to request a hearing, but gives no such right to those who resign.

6

opportunity to clarify the factual basis of her appeal. In the absence of a factual basis for her appeal, no determination could not be made regarding whether jurisdiction existed that would entitle Tatum to a hearing in this forum. The undersigned ordered Tatum to set forth the factual basis for her discrimination claims. A proper factual basis was also required to provide adequate notice to the Secretary of the allegations in the event jurisdiction existed, as well as to define and narrow the issues to be heard.

On or about January 25, 2005, the parties were sent a notice of a pre-hearing conference. The pre-hearing conference was set at the earliest possible time available for both parties on February 2, 2005. At the time of the pre-hearing conference, Tatum still had not plead the facts to support an appeal. Following the pre-hearing conference, the undersigned issued the following order providing Tatum a fourth opportunity to clarify her appeal. The order provided in pertinent part:

A status conference was held on February 2, 2005. Trey Granger, Esq. appeared for the Secretary of State and Norbert Williams, Esq. appeared for the Employee. The Employee has appealed her termination, however as of this date, she has failed to properly state a claim upon which relief can be granted per Rule 670-X-4-.03. **In order for jurisdiction to exist, the Rule requires some demonstrative showing of discrimination due to race, sex, national origin, age, handicap, political or religious affiliation. The Employee has until Monday, February 7, 2005 to clarify her**

**claim   ...**

Finally, on February 7, 2005, Tatum clarified the factual basis for her appeal as

follows:

> During [Secretary of State] Worley's tenure as Tatum's supervisor,
> Worley systematically imposed unwarranted disciplinary actions
> against Tatum. Specifically, prior to the events of October 19, 2004,
> Worley reprimanded Tatum approximately three times for alleged
> workplace violations. None of those alleged workplace violations
> have any basis whatsoever in fact.
>
> Further, Worley engaged in conduct which was designed to impede
> Tatum's ability to successfully carry out her workload, such as
> stripping Tatum of any assistance in carrying out her day's work and
> prohibiting others within the Secretary of State's Office from
> assisting Tatum with her workload.
>
> In the final action, on or about October 19, 2004, Worley falsely
> accused Tatum of failing to properly maintain the Secretary of State's
> data base which contains the number of registered voters in this state.
> Following those accusations, Worley demanded that Tatum resign
> from her position of Supervisor of Voter Registration. In the
> alternative, Worley threatened to fire Tatum. The cumulative effect
> of Worley's mistreatment of Tatum on Tuesday, October 19, 2004,
> coupled with Worley's past mistreatment of Tatum, and Tatum's
> FMLA qualified condition of panic attacks overwhelmed Tatum and
> left her with a feeling of having no other choice but to resign as
> demanded by Worley.   At all relevant times, Worley's mistreatment
> of Tatum was motivated by Worley's intention to discriminate against
> Tatum due to Tatum's political views and opinions. ...

The Secretary of State responded that when each of the claims made by

Tatum were examined, they failed to individually or collectively state a claim for

unlawful, political discrimination. The Secretary correctly pointed out that in order

to state a claim for political discrimination, Tatum must allege that:

> (1) That she engaged in a constitutionally or statutorily protected
>
> conduct or expression;
>
> (2) That she suffered an adverse employment action; and
>
> (3) That a causal connection exists between the two events. *Cooper*
>
> *v. Southern Co.*, 390 F. 3d 695, 740 (11th Cir. 2004)(citing *Meeks v.*
>
> *Computer Assoc. Int'l*, 15 F. 3d 1013, 1021 (11th Cir. 1994)).

To state a claim for retaliation in violation of the First Amendment, a public

employee must allege that the political views he or she expresses are protected

speech. An employee must further allege that he or she was retaliated against

because his or her speech was on a matter of public concern. *Stravropoulos v.*

*Firestone*, 361 F. 3d 610, 618 (11th Cir. 2004). Moreover, an employee may allege

that the action taken by the Secretary was "likely to chill the exercise of

constitutionally protected speech." *McCabe v. Sharrett*, 12 F. 3d 1558, 1564 n.3

(11th Cir. 1994); *Goffer v. Marbury*, 956 F. 2d 1045, 1049 n. 1 (11th Cir. 1992).

Tatum did not claim that her medical condition for panic attacks involved a

claim under the ADA (Americans with Disabilities Act) but rather, she made a

casual reference to FMLA (the Family and Medical Leave Act). Moreover, Tatum

9

did not charge any basis for a complaint regarding her leave, a request for taking

leave, or any other element associated with an FMLA claim. Consequently, this

portion of her allegations was dismissed for failure to state a claim.[6]

On March 29, 2005, the undersigned issued an order specifically detailing

why Tatum's pleadings failed to state a claim under *Ala. Admin. Code* § 670-X-

18-.02 (which is permitted for dismissals only, not resignations). The undersigned

also addressed Tatum's claims regarding political discrimination finding that

based upon the facts alleged, Tatum, as a matter of law, failed to state a claim

upon which relief could be granted for political discrimination. However, the

undersigned held that *Ala. Admin. Code* § 670-X-4-.03 could provide a basis for

appeal for unlawful discrimination based upon Title VII and other "non-merit

factors." Not only was Alabama law examined, but the law in other jurisdictions

was researched to determine whether Tatum stated a possible basis for appeal

under the "non-merit factors" provision. In short, other states addressing the

question have found that "non-merit factors" include any other unlawful form of

discrimination as defined by state law or other amendments which may be made to

Federal discrimination laws. The provision has also, in a few courts, been held to

---

[6] To state an FMLA claim the employee must plead and prove that she placed the Secretary on notice of a
federally recognized and legally protected medical condition, that she requested leave for that condition, that she
suffered an adverse employment action, such as being denied leave for the condition and that the decision to deny the
leave was causally related to her protected activity. Tatum, however never alleged facts to support an FMLA claim.

prohibit discrimination in the form of an adverse employment action where the factual basis for the employment action later proves to be false. In the present action, Tatum contended that she was forced to resign because of an inaccuracy in the State Voter Registration Records, yet within hours of her resignation, it was determined that the Voter Registration Records were, in fact, accurate.

Although Tatum failed to specifically plead the "non-merit factor" issue as a basis for her appeal, she sufficiently alleged that her resignation was premised upon a factual representation by her supervisor which later proved to be false.

Accordingly, this appeal presented limited questions for review.[7] Stated differently, the review in this cause was limited to the events surrounding or relating to her resignation, and whether the resignation was tendered based upon facts which proved to be false or inaccurate. The undersigned also considered whether Tatum's resignation involved a supervisor who had an unreasonable or false misunderstanding regarding Tatum's job duties on that date, which was used to coerce Tatum's resignation. *Ala. Admin. Code* § 670-X-4-.03. *See Quarles v. Comm. of the Dept. of Trans.*, 61 Pa. Commonwealth 572, 434 A. 2d 864 (1981). *See also State Correctional Inst. at Albion v. Bechfold*, 670 A. 2d 244 (Pa.

---

[7] It is important to note that the question presented is much narrower than in dismissal actions. While dismissal appeals encompass many more factors to determine whether the disciplinary action is warranted, the focus here is solely upon whether the alleged act constitutes an unlawful discriminatory act.

Cmwlth. 1976) (where the court held that where an employee was dismissed based upon the falsification of records and it was later determined that the records had in fact not been falsified, the Employee was due to be reinstated); *See also State Correctional Inst. v. Morse*, 141 Pa. Cmwlth. 570, 596 A. 2d 897 (Pa. Cmwlth. 1991). The undersigned held that a "mistake in fact" may, in some cases, provide a basis for an appeal, particularly if competent evidence was disregarded. However, the parties were instructed that the scope of the appeal did not open the door to other irrelevant acts. Rather the evidence presented must reasonably relate to Tatum's resignation.

Throughout this appeal, the Secretary of State contended that Tatum failed in her responsibilities to maintain account of the State's voter registration records. Specifically, Worley stated that it was not Tatum's inability to *completely* explain the voter registration discrepancies, but rather her failure to offer, or make a serious attempt to offer, *any* explanation to critical discrepancies for the 8 counties at issue on October 19, 2004. Moreover, Worley argues that Tatum made very little effort in a critical situation to assist in the resolution of the discrepancies at issue.

Tatum also argued that the Secretary possessed an unreasonable and false understanding of Tatum's job responsibilities. Tatum contends that Worley

12

requested the resignation due to a false belief that Tatum's job duties encompassed

an ability to respond to questions which could only be answered by computer

programming personnel. Absent the assistance of a computer programmer, Tatum

contends she could not possibly respond to the Secretary's questions.

On or about April 15, 2005, the undersigned conducted a pre-hearing

conference whereby the parties selected July 11, 2005, for the hearing date.[8] The

parties requested time to conduct discovery and prepare for the hearing.

---

[8] Pursuant to the Pre-hearing conference order, the Secretary filed a Short Plain Statement of the Facts which set forth the Secretary's position in this cause. In a position statement dated April 22, 2005, the Secretary stated as follows:

> Anita Tatum served for approximately 16 years as Director of Voter Registration, which later became Supervisor of Voter Registration. Tatum was responsible for maintaining accurate voter registration lists and a database, known as ALVIN (Alabama Voter Information Network), containing statewide voter registration information. The Supervisor of Voter Registration is also responsible for publishing certain ALVIN data on the Secretary of State's website. Shortly before the 2004 General Election, the office provided ALVIN data to the Press. Immediately afterwards, the Associated Press and the New York Times Regional Newspapers confronted the Secretary with differing numbers when they compared the ALVIN numbers with the Tatum data on the website. The Press demanded an explanation. In response to their demand, the Secretary called in the person responsible for maintaining both sources of information – Anita Tatum. The Secretary explained the critical nature of these discrepancies and the urgency of explaining the discrepancies. The Secretary instructed Tatum to examine the conflicting data and determine if there were errors of if there were [explanations] for the apparent discrepancies The Secretary assured the Press that the Office would give them a response before the end of the day. In the meantime, the Press camped outside the Secretary's door. The secretary did not receive a response from Tatum and shortly before 5:00 p.m., the Secretary requested that Tatum bring her findings to the Secretary's office. Tatum told the Secretary that she could not explain the discrepancies and had no idea how to figure it out. In essence, Tatum simply threw up her hands, abandoned her responsibilities and left the Secretary to deal with the situation. Tatum demonstrated an obvious lack of fundamental knowledge of her primary responsibility and an inability to function in a crisis. Tatum was then, appropriately offered the option of voluntarily resigning or being placed on leave pending a full investigation with discipline up to and including termination. Tatum voluntarily resigned. The Secretary was then left with the distasteful task of confronting the Press and admitting that the Secretary of State's Office had no explanation for the discrepancies in the number of registered voters on the two lists. The Office later confirmed that, in fact, there were errors in the data that Tatum published on the website. The Office then began to reconcile the two lists and restore the credibility of the Office.

Thereafter, counsel for Tatum filed voluminous discovery and notices of deposition (which are normally not permitted except for witnesses who are unavailable for trial, witnesses to which the parties agree to depose or other extraordinary circumstances.)[9] The Secretary filed a limited number of discovery requests, including a set of Requests for Admissions, a request for production of documents and various deposition notices. Requests for Admissions are deemed admitted per Ala. R. Civ. P. 36 within 30 days unless specifically denied. Tatum never filed a response to the Request for Admissions either admitting or denying them. Thus, the following facts were deemed admitted:

- On October 19, 2004, Anita Tatum served as Supervisor of Voter Registration.

- As Supervisor of Voter Registration, Anita Tatum was responsible for maintaining accurate voter registration lists.

- As supervisor of Voter Registration, Anita Tatum was responsible for maintaining a database known as ALVIN (Alabama Voter Information Network).

- The ALVIN database contains statewide voter registration information.

---

[9] The Secretary of State's Office notified the undersigned that it produced approximately 4,000 pages of documents in response to Tatum's requests.

- As Supervisor of Voter Registration, Anita Tatum was responsible for publishing certain ALVIN data on the Secretary of State's website.

- On or about October 19, 2004, members of the Press contacted the Office of the Secretary of State.

- On or about October 19, 2004, [a] member of the Press reported to the Office of the Secretary of State that there were apparent discrepancies in some of the voter registration numbers that were published on the website and voter registration numbers downloaded from ALVIN.

- On or about October 19, 2004, the Secretary of State instructed Anita Tatum to examine the conflicting data, determine if there were any errors or if there was an explanation for the apparent discrepancies and to provide any such explanation to the Secretary.

- At approximately 5:00 p.m. on October 19, 2004, Anita Tatum admitted to the Secretary of State that she could not explain the discrepancies in the voter registration numbers.

- Anita Tatum signed a letter of resignation after 5:00 p.m. on October 19, 2004.

- At the time that Anita Tatum signed the letter of resignation, she still had not provided any explanation for the discrepancies in voter registration

15

numbers.

In June of 2005, Constance Barker, Esq. entered an appearance on behalf of the Secretary of State. However, because Barker is an attorney/shareholder with the law firm of Capell and Howard (the same law firm as the undersigned's husband), her representation presented a conflict of interest. On July 1, 2005, the Secretary of State moved to continue the hearing on the grounds that the Alabama Legislature was scheduled to begin an emergency session regarding the State's budget for fiscal year 2006 which would require the Secretary's full attention, and her absence would significantly impact the effective functioning of the office. A second motion to continue was filed on July 5, 2005, to allow the Secretary to obtain new counsel. The Secretary's Motion for Continuance was granted and the case was reset for September 26-27, 2005. The parties agreed upon the date and represented that the case would take approximately two days.

On or about September 12, 2005, the Secretary filed another request for continuance. As grounds for the continuance, the Secretary explained that in order to hire new counsel, the Secretary of State's Office had been advised by the Governor's Office that the procedure for obtaining new legal counsel required compliance with Alabama State Bid law. Although the bid process had begun, representation could not be completed in time to adequately prepare for the

16

hearing.    Furthermore, although the Secretary's newly appointed counsel, attorney

John Bolton, had verbally committed to representing the Secretary of State,  he

was scheduled to be out of the country on September 26-27, 2005.  Moreover,

Bolton asked for additional preparation time due to the complex nature of the facts

and voluminous discovery.  Counsel also represented that both parties still

intended to take depositions and that both parties would require an additional 6 to

8 weeks to complete.    Additionally, the Secretary of State's in-house legal

counsel, Trey Granger, had left the Secretary's Office and accepted other full-time

employment.    Consequently, Granger was not readily available to assist with

preparation.

The undersigned conducted another status conference and reset the matter

for hearing on November 14 - 15, 2005.  Tatum's counsel did not object to the

dates selected for the hearing and both parties represented that they agreed to the

continuance.  Upon the consideration of these factors, the undersigned granted the

motion for continuance.

On November 1, 2005, Tatum filed a motion to stay the proceedings on the

grounds that he had discovered new evidence of grossly inappropriate conduct in

supervisory authority over Tatum.  Counsel vaguely alleged, without supporting

factual allegations, that he intended to expand the appeal to include the new claims

17

that would require additional time to assess the matter. In addition, Tatum's counsel maintained that the Supreme Court of Alabama was reviewing a decision regarding sovereign immunity which could provide a basis for expanding Tatum's claims. Tatum's counsel further alleged that the Supreme Court appeal could impact the question of whether a claim for constructive discharge existed. The Secretary of State objected to the motion for a variety of reasons, including but not limited to, the vagueness of Tatum's alleged "new claims" and the fact that Tatum's counsel failed to timely raise the issue, given that the Court of Appeals case, upon which the Employee's counsel relied, had been pending for more than a year. Accordingly, Tatum's Motion to Stay was denied.

The hearing began on November 14, 2005. After three days of testimony, the hearing recessed. The parties indicated an intent to present an additional two days of testimony, but scheduling conflicts prevented the parties from continuing the trial later in the week. The parties were asked to contact the undersigned with dates to resume the hearing as soon as possible. It was intended that the hearing would resume within the next few weeks in November or December. Both counsel for the Secretary and the Office of the undersigned attempted to contact Tatum's counsel numerous times to determine when the action might be resumed. Calls were made in December and January; however, Counsel would not return the

18

telephone calls until late . Not until around January 26, 2006 was the undersigned

able to join the parties in a telephone conference. The undersigned attempted to

reset the hearing in February, March and April, giving the parties a selection of

various dates. Tatum's counsel represented that due to the Legislative Agenda, the

pending birth of his children and subsequent paternity leave, he would not be

ready to resume the hearing until May 10, 2006. The parties represented that they

anticipated that two additional days of testimony would be required.

Consequently, on February 2, 2006, the undersigned reset the remaining matter for

hearing on May 10-11, 2006.

On or about May 9, 2006, the parties filed a "Joint Motion To Present The

Remaining Testimony By Affidavit and Post Trial Briefing Schedule." The

motion was granted and post-trial briefs were due in June, 2006. Thereafter, the

parties also submitted a three volume transcript of the November hearing which

exceeded 965 pages in length.[10]

## II. FACTUAL BACKGROUND

Following a review of all of the relevant and admissible evidence in this

cause, the undersigned finds that the more credible evidence supports the

---

[10] In addition to the submitted briefs, affidavits, and numerous exhibits, the parties also submitted for review a three volume transcript of the November portion of the hearing which includes more than 965 pages of testimony. All totaled, the three volumes of transcripts, briefs, numerous pleadings, motions and exhibits in this case constitute well over two thousand (2,000) pages of record for review.

following findings of fact.

Since the Secretary of State alleges that Tatum failed in the performance of her job to keep accurate and up to date records on October 19, 2004, critical to an understanding of this appeal is:

- the Secretary of State's organizational structure,

- the responsibilities of each division, the ALVIN[11] database system which recorded the State's registered voters, and

- Tatum's responsibilities and the matters over which Tatum exercised control.

**Organization of the Secretary of State's Office**

Prior to 2003, Tatum was employed as the Director of the Office of Voter Registration, an agency separate and distinct from the Office of the Secretary of State. Following the passage of state and federal legislation, the Office of Voter Registration was merged into the Secretary of State's Office.[12] Tatum's title in the

---

[11] Alabama Voter Information Network: a computer database maintained by the Secretary of State listing all registered voters in the state.

[12] *See Alabama Code* §§ 17-4-210 and 211 (1975). The Federal Help America Vote Act (hereinafter "HAVA") passed by Congress mandated that only one uniform voter registration list be maintained by Secretary of State. HAVA required each state to implement ACT. Alabama created its own HAVA Act which merged the Voter Registration Office with the Secretary of State's Office. The Secretary of State's office was giving the responsibility to create and maintain a voter registration list. Act 313. Tatum's Office lobbied against it while SOS lobbied for it. There was some animosity between the two Offices during the course of this legislation being passed. The new Act made Tatum the new Supervisor of Voter Registration within Secretary of State's Office. The duties assigned to Tatum were almost identical to that which she had before with only one or two new duties added, such as military registration. Tatum's job description was assigned by the legislature. Tatum received a list from the Public Health

Secretary of State's Office changed to "Supervisor of Voter Registration."[13]    At

Department of death reports.    She also received reports from the court regarding felons as well as other reports regarding individuals who are no longer qualified to vote.

[13]    According to *Ala. Code* § 17-4-211 (1975) which was amended in 2004 to accommodate the HAVA legislation, the Supervisor of Voter Registration is responsible for the following:

(1) To keep the minutes of the meetings of the Voter Registration Advisory Board, conduct the day to day business activities of the Voter Registration Advisory Board and give progress reports on such activities at its meetings;

(2) To serve as a liaison between the Secretary of State and the county boards of registrars on implementation of existing and future laws pertaining to voter registration;

(3) To provide to the county boards of registrars such information as would allow them to determine which names should be stricken by them from voter lists in accordance with state law;

(4)  To provide assistance to the county boards of registrars in determining the names of any person or persons who are deceased, who are no longer qualified to vote in the election district where registered due to removal of his or her residence from the county in which he or she is registered, or from the State of Alabama, who has been convicted of a disqualifying crime, or who is otherwise no longer qualified to vote as may be provided by law;

(5) **To establish and maintain a statewide voter registration list including all registered voters of the state as such information is reported to the Supervisor of Voter Registration by the boards of registrars or judges of probate of the various counties;**

(6) **To maintain all information furnished to the Supervisor of Voter Registration relating to the inclusion or deletion of names from the lists of registered voters;**

(7) To acquire by purchase, lease, or contract, the use of such equipment as required to establish a fully centralized statewide voter registration list which will allow the computerization; of all the offices of the boards of registrars throughout the state upon legislative approval of funds for such computerization, the communication of necessary information between the boards of registrars and the Supervisor of Voter Registration; storage and instant comparison of names and other identifying information contained in voter lists, automatically identifying duplicate entries, produce in printed forms selected names or lists of names with identifying information; and do such other tasks as may be designated for it by the Supervisor of Voter Registration;

(8) To recommend producers and administrative rules to the Secretary of State and prepare forms necessary to properly carry out such duties set forth herein;

(9) To secure from each county voter registration information and from any state department, agency, board, bureau, or commission, or from any other sources, information regarding the death, conviction of disqualifying crime, or removal of residence from the county or state of any registered voter;

(10) To furnish, at a reasonable reproduction cost and within 14 days of receipt of the request, voter registration lists limited to the names, addresses, and political subdivisions or voting places to candidates for election or political party nomination to further their candidacy, political party committees or officials thereof for political purposes only, incumbent officeholders to report to their constituents; nonprofit organizations which promote voter participation and registration for that purpose only; and for no other purpose and to no one else; failure to furnish the requested voter registration list within 14 days of receipt of a request shall result in no charge to the requesting entity and the cost shall be absorbed by the Secretary of State;

(11) To perform such duties pertaining to voter registration as may be assigned by the Secretary of State;

(12) To supervise persons employed by the Secretary of State, subject to the state Merit System laws and entitled to the rights of benefits thereunder, as may be necessary to carry out this article;

21

the time this action commenced, the Secretary of State was Nancy Worley.

Following the merger, the budget for the Voter Registration Department was reduced by about 50%.[14]  The Secretary decided to distribute the employees previously assigned to Tatum's supervision throughout the Secretary of State's Office.[15]  The Secretary assigned the former Voter Registration IT personnel to the Secretary of State's IT division and other skilled personnel to divisions consistent with the established organizational structure.

While Alabama law charged Tatum with a large number of responsibilities for overseeing the Voter Registration System, Tatum relied upon other employees to perform certain duties necessary to accomplish her tasks.  Some of Tatum's statutory responsibilities were simply not performed during her tenure at the Secretary of State's Office, e.g., taking minutes during certain meetings with the Voter Registration Board, because these meetings did not take place during that time.

The Secretary organized the office into several different divisions:

---

(13) To train, counsel, advise, and evaluate registrars in the performance of their lawful functions;
(14) To provide military and overseas voters with voter registration applications and absentee ballot applications and otherwise assist such voters with information helpful in becoming registered, changing registration and obtaining absentee ballots; and
(15) To provide information relating to procedures for registering and voting an absentee ballot.

[14]  Testimony of Secretary Worley.

[15]  Testimony of Secretary Worley; Testimony of Tatum.

22

- The Administrative Division (which included Finance);

- The Election and Governmental Services Division; and

- The Business Services Division.

The Head of the Elections Division at the time of this incident was Vicky Balough (hereinafter "Balough"). The Secretary appointed Balough as Tatum's immediate supervisor. The Secretary of State served as the head of the Administrative Division. The Business Division included individuals working with incorporations, Alabama corporate licenses and other similar types of transactions.[16]

The Secretary of State also maintained a website wherein the voter registration numbers were posted. These voter registration numbers derive directly from the Secretary of State's database commonly referred to as ALVIN, (an acronym for the Alabama Voter Identification Network.)   The webmaster, Adam Alexander, posted the numbers to the site.   Prior to Adam Alexander, Ed Packard held the webmaster position and posted the ALVIN numbers on the website.

Tatum, as the former Director of the Office of Voter Registration for more than 15 years, officially recorded the State's registered voters. This job

---

[16]. Secretary of State's Ex. 6.

23

responsibility remained the same when she became the Supervisor of Voter

Registration. Tatum's unparalleled experience in developing ALVIN for the State

required her to work specifically with each county registrar to develop a database

which catered to the individual systems of the State's 67 county registrars. Tatum

possessed some knowledge regarding the various county methods and software

utilized to upload voter registration information into the State's database.

Originally, Tatum and computer programmer Sheldon Jeames created ALVIN in

1991. Tatum recalled that Coosa County became the first county to "go online."

The collective effort between Tatum and Sheldon Jeames created the statewide

ALVIN database, recording all registered voters specifically organized by county.

Sheldon Jeames technically programmed the system by writing the technical

programming language in basic code. Tatum, on the other hand, provided Sheldon

Jeames with the design parameters and specifications for the system after

collaborating with county registrars. Tatum also examined similar systems in other

states to use as a model for the Alabama system. The State created ALVIN for the

purpose of maintaining a centralized, standard database for voter registration

information. The system allows each county registrar direct access, thereby

permitting each county registrar to add or delete information regarding their

24

particular county.[17]  Sheldon Jeames testified that 65 counties have a direct link to the system.  These counties send "batch processes" to regularly update ALVIN. Since 1991, Sheldon Jeames and Tatum have demonstrated the system to county registrars who, in turn,  made specific suggestions regarding the system's performance and integration with each county.  Often Tatum and Sheldon Jeames altered ALVIN's programming to enable counties to account for all types of voters,  both active and inactive.  Tatum routinely directed the registrars to enter information in ALVIN on or about the 10th  of each month.  Tatum also acted as a liaison between the technical department and the county registrars.

Sheldon Jeames testified that after Tatum transferred to the Secretary of State's Office, his contact with her became more limited.  Since the Secretary of State included a data processing and technical division, the Secretary of State's IT Division absorbed the responsibilities of uploading the voter registration information into ALVIN.  While the Secretary of State's Office contacted Sheldon Jeames on occasion for programming assistance, he ceased ALVIN's day to day maintenance.  In the Secretary of State's Office, Deanne Jeames became Tatum's primary contact for ensuring the accuracy of the counties' voter registration information.    Tracy Cleckler also assisted with these tasks.

---

[17]  Testimony of Sheldon Jeames.

Inactive voters are defined as those registered individuals who have not voted in the past four years. Purged voters are often confused with inactive voters. However, purged voters are defined as those individuals who no longer are eligible to vote due to death, mental infirmity, change of residence or commission of certain crimes. Sometimes the ALVIN system failed to match local systems because of the lack of compatibility between ALVIN and a county registrar's software or because of a county's programming classification of inactive voters. Sheldon Jeames explained that if an error occurred, ALVIN would first notify the county registrar of the error. The county registrar would correct the error at a local level. Neither Tatum nor the Secretary of State changed local errors. Corrections to the data were generally made only by individual county registrars.

Different counties maintained various methods of input into ALVIN. Some counties would email their information to the webmaster, others uploaded directly into ALVIN, while others mailed in the information on a computer disk. Although the information should have been sent monthly, not all counties were consistent, compliant or timely. Additionally, some counties encountered programming issues when attempting to upload the data.[18] Some registrars kept dual systems,

_____

[18] SOS Ex. 17, p. 914. For instance, in one email from the Shelby County registrar's office, the registrar had difficulty uploading information and insisted that they should not have to maintain records regarding inactive voters. The email states in pertinent part:

one database for ALVIN, and a local database. Although counties were required

to report both active and inactive voters, not all the counties complied with this

mandate in a consistent manner. For instance, some counties, Shelby County in

particular, only sent in the number of active voters and did not routinely upload

the number of inactive voters into ALVIN. For this reason, Shelby's local system

recorded a larger number of registered voters than the State since the local

database accounted for both active and inactive voter registrations. However,

Shelby County's database failed to include inactive voters when uploading to

ALVIN. Tuscaloosa, Fayette and St. Clair counties encountered similar problems

due to software compatibility issues between their local system and ALVIN.

Jefferson and Mobile counties sent their information in a different programming

configuration than the ALVIN system. Consequently, the Secretary of State's IT

personnel were required to convert the data for the ALVIN system. Over 30

counties maintain their own independent county system.

   As a matter of procedure in the Secretary of State's Office, counties would

---

3 records from the update file listed below that was processed on 8-30-04 were "skipped because
of errors". It seems that we used to get a report that listed the detail info on the records that were
rejected, but we don't seem to get that detail anymore. If you want us to try and fix these errors...
then we will need to have this additional information.... One other thing, could you explain to
everyone in your department that Shelby County does not maintain inactive voters in the Alvin
system. We never have. We have no plans to. We see no reason to. We never agreed to. We
maintain inactive voters only on our local system. So, therefore, any reports from the Alvin system
that involve inactive voters will not match any reports from our local system that involve inactive
voters....

27

take the information and forward it to other employees in the ISD Department. ISD would then use the data to update ALVIN.

**Events Prior to October 19, 2004**

Worley testified that, prior to 2004, she felt Tatum was not fully aware of the events occurring in the Elections Division. However, the evidence demonstrated that Worley expected Tatum to handle many of the clerical tasks which Tatum previously delegated to others, in addition to her statutory duties. Worley and Robert White (another Secretary of State employee) testified that during an "election season", all employees, particularly management employees, arrived early and worked late, in order to manage the workload. Worley testified that Tatum had no need of any clerical or other support and that other employees were readily available to help Tatum if necessary. Tatum advised Worley that, in addition to responding to calls from local judges, registrars, and citizens, she was also trying to process several hundred voter applications on a daily basis, which Worley insisted be "turned around" in a 24-hour period. Tatum also personally responded to emails and phone calls from the public and county registrars, in addition to her statutory duties.[19] Worley testified she had to counsel Tatum on several occasions that she

---

[19] SOS Ex. 17, page no. 598. When Tatum requested that Worley advise her of the matters which Tatum should prioritize, Worley stated, in substance, that all tasks must be completed and did not give Tatum any further guidance. In short, Worley stated that all employees were having to cope with similar workloads. Her response to Tatum stated:

28

was expected to remain at her desk to handle these issues.[20]

Worley expected Tatum to review the data sent to her by local registrars prior to forwarding the information to ISD to be updated in to ALVIN or by the webmaster on to the website. However, Worley acknowledged that some counties only sent in a disk rather than a hard copy of the information. Worley did state that she did not expect Tatum to open the disk with the information.

Worley admitted to having previous disagreements with Tatum regarding the passage of the legislation which merged the Office of Secretary of State with the Office of Voter Registration. Worley also admitted that she instructed her division directors to make layoff recommendations due to budget cuts. Worley stated that Tatum's Division Director made the recommendation that Tatum should be selected for the layoff. This occurred about 2 months after the merger in 2003. However, in light of Tatum's statutory responsibilities, some discussion took place regarding whether it was legally possible to place Tatum's position on the layoff list.

---

"We are all having the same volume of work which you are experiencing. This is typical of any election "season," I am told. You will have to keep telephone calls brief, try to have a 24 hour turnaround time on applications which come to this office (some that can be processed while you are on the telephone), and work on petitions for a designated time period each day. As a management level employee, you may have to come to work early and/or stay late to get everything done during this particular election season; however, there is a light at the end of the tunnel – after the first week in November, the work load lessens."

[20] See letters contained in Tatum's personnel file.

29

It is undisputed that Tatum never received an annual performance evaluation while working in the Secretary of State's Office. However, Tatum was aware of her statutory obligations itemized in *Ala. Code* § 17-4-211 (1975). She also received a pre-appraisal, setting forth her various job duties.

With the passage of the HAVA legislation, Secretary Worley attempted through Tatum to require local registrars to update county information either daily, weekly, or as soon as practicable.[21] Worley, through Tatum, sought to match local data with the ALVIN system. However, the evidence supports the conclusion that, as a practical matter, the local registrars, who were beyond Tatum's control, were not always fully compliant. Although Tatum could call and repeatedly ask for the information, she had little control over the county registrars.[22]

Emails indicate that Tatum reported to her supervisor in the Secretary of State's Office that she routinely worked with other employees on the ALVIN system and routinely talked to counties about their systems corresponding to ALVIN.[23]    Robert White, who became Tatum's supervisor following the

---

[21]  SOS Ex. 15.

[22]  Testimony of Sheldon Jeames.

[23]  SOS Ex. 17. For instance in an email to Robert White from Anita Tatum dated July 7, 2004, Tatum reported:
"This past week I have, as always, spent a big part of the day answering registrars questions and helping them prepare for the election. This is the first major presidential election and city election for over two thirds of the registrars. Taking and filing orders for the cities. I have helped Judy

departure of Vicky Balough, testified that Tatum routinely reported to be working almost daily with Deanne Jeames in the IT department to determine whether the ALVIN numbers corresponded with the county voter registration information.

White testified that prior to an election, phone calls were voluminous and the workload was heavy. Employees routinely worked until 10 p.m. He stated that Tatum often complained about her workload and often commented that she would quit if things did not change. At the time of the hearing, White had assumed Tatum's previous position and was serving as the Interim Director of Voter Registration. White opined that Tatum was often derelict in her duties because there were some tasks which she failed to timely perform. However, White did not record any disciplinary action involving Tatum.

Linda Nelson, the Director of Personnel for the Secretary of State's Office, who testified that she is Tatum's friend, also reported Tatum did not like working in the Secretary of State's Office and was bitter, angry and negative about working there.

---

Wagnon with the instructions for the Alabama Military Personal Guide and Voter Guide. I have answered questions from the public, judges, clerks, etc. on election issues. I, as always, work with Deanne [Jeames] on the ALVIN system and talked to many of the counties on their systems matching up with ALVIN. Worked out with Jefferson county [sic] to obtain their voter histories. Taking numerous orders for the voting lists. Answered many emails concerning voting issues. Trying desperately to keep up with the mailings to the registrars. I have as I do every month, collect the totals of registered voters from the counties."

31

**The Events Surrounding Tatum's Resignation**

On October 19, 2004, a member of the press contacted the Secretary of State's Press Representative, Judy Wagnon, and requested a current accounting of the numbers of registered voters in the State of Alabama. Wagnon provided a list of the number of registered voters broken down by county. After a review, the reporter discovered that the number of registered voters on the list provided by Wagnon in October of 2004 was fewer than the totals posted on the Secretary of State's website for the month of August of 2004. The reporter questioned the validity of the October number in light of the fact that counties were reporting a record number of new registrations. Naturally, new registrations would more likely result in an increase in the number of registered voters rather than a decrease. Wagnon informed the Secretary of State of the reporter's inquiry and advised her that the reporter requested an explanation by the close of business.

Given the fact that the State was so close to a Presidential election, the Secretary of State did not wish to risk compromising the credibility of either the election or the Secretary of State's Office. Worley first called her in house legal counsel, Trey Granger, to assist her with the problem. Wagnon, the Press

Secretary, also assisted. Next, Worley contacted Tracy Cleckler.[24] Clecker promptly printed off the ALVIN numbers and walked them across the street to Granger, Wagnon and Worley. According to Granger, he, Wagnon, Cleckler (and possibly Mickey Moore) began working to explain the discrepancy. Together, they charted in a spread sheet format the number of registered voters in each county.[25] The spreadsheet compared both sets of numbers for each county.[26]

Secretary Worley, Wagnon, Granger and Cleckler narrowed the discrepancy down to eight counties, specifically, Bullock, Fayette, Lee, Macon, Mobile, Shelby, St. Clair and Tuscaloosa.[27]

Cleckler testified that he was first contacted about the discrepancy after Wagnon asked him to produce some numbers from the ALVIN system. Cleckler discussed the matter with Tatum that morning, as well as the fact that the numbers were off.[28] Cleckler and Tatum specifically discussed Fayette County. Cleckler

---

[24] Given the fact that Worley contends that this was Tatum's primary responsibility, it struck the undersigned as odd that Tatum was one of the last people Worley contacted.

[25] SOS Ex. 22A. They compared the ALVIN print out (SOS Ex. 9 B) for October 19 versus the numbers reported as of August 2004, (SOS Ex. 9 C).

[26] SOS Ex. 9 A. On the left side of the worksheet is Tracy Clecker's handwriting. Secretary of State's handwriting is on the opposite side.

[27] SOS Ex. 9 D.

[28] Cleckler Testimony.

33

believed this conversation occurred sometime about 9:30 a.m. to 10:00 a.m.[29]

Sometime during the day, Tatum asked Cleckler how he ran the numbers. Cleckler

responded that he ran the actual numbers in the database, and Tatum then asked

him to run the totals another way. Tatum also asked Cleckler if he was sure he had

run the query correctly.

Sometime between 2:00 p.m. and 3:30 p.m. that afternoon, Worley

contacted Tatum because, as the Supervisor of Voter Registration, Tatum was the

person charged by statute with maintaining voter registration lists. Accordingly,

Worley asked Tatum for assistance in investigating and explaining the

discrepancies. In particular, Worley directed Tatum to provide an explanation

regarding the discrepancies in these eight counties by the end of the workday,

between 4:30 p.m. and 5:00 p.m. Worley explained that two reporters were waiting

and wanted an answer that afternoon. Worley did not demand Tatum completely

reconcile the numbers, but rather, she insisted upon Tatum performing some

investigation or inquiry to explain the inconsistences with the ALVIN system.

Tatum returned to her office and made a few phone calls. The phone records

from Tatum's office from 2:27 p.m. through 4:19 p.m. reflect approximately seven

---

[29] Cleckler Testimony. This contradicts Tatum's testimony that the first time she learned of the discrepancy was about 3:30 p.m.

long distance phone calls, mostly 1 to 3 minutes long to the following areas:

Fayette (Fayette County), Ashville (St. Clair County), Opelika (Lee County), Bay

Minette and Mobile (Mobile County) and Cullman.[30]  The records do not reflect

calls to the Tuscaloosa, Bullock, Macon or Shelby County registrars.  Tatum's

calls combined for a total of only 18 minutes.  Most of the calls only lasted 1

minute, and the longest call lasted 6 minutes.[31]  Tatum states she  attempted to

contact Sheldon Jeames and an IT person.  Tatum contends that she could not

answer any of Worley's questions about the 8 counties without the assistance of an

IT person.  However, Sheldon Jeames testified that Shelby County defined their

inactive voters differently than the ALVIN system.  Sheldon testified that the

resolution of the matter did not require a computer programmer, but rather, a call to

the county registrar inquiring why the county listed no active voters.  Thus, a

simple phone call, not computer programming expertise, would have shed some

light on the Shelby County discrepancy.

    Next, rather than continuing to investigate the matter and constructively

utilizing the remaining time to address the issue, Tatum elected to draft a

memorandum with the assistance of a co-employee, Ed Packard,  explaining that

---

[30]  SOS Ex. 19.

[31]  Tatum contended that she talked to one registrar for 8 to 10 minutes, but the phone records fail to support this contention.

she could not provide any explanation for the discrepancies without the assistance of Sheldon Jeames. While Tatum attempted to argue that her responsibilities with ALVIN were much too limited after her transfer to the Secretary of State's Office, the evidence demonstrated she knew a great deal more about the ALVIN system and the various counties at issue than she reported to Worley. In sum, the evidence establishes that Tatum possessed enough information to provide possible explanations for the errors. Moreover, in the allotted time, she could have made some attempt to contact the remaining county registrars.[32]

Tatum admitted at the hearing that she could have determined the source of the discrepancies had she been given the time and a more relaxed atmosphere.[33] Tatum also admitted that she routinely worked with Deanne Jeames on the ALVIN system and that she talked with many counties about resolving their issues with regard to integrating the local systems with ALVIN. Tatum was aware that some counties uploaded their information, while others mailed in their data, and she

---

[32] For instance, in order to resolve the question regarding Shelby County, Sheldon Jeames testified all it took was a telephone call to the county registrar. Jeames spoke to SOS employee Cleckler and then contacted an individual in the Shelby County registrar's office about the information needed to update the ALVIN system. However, Jeames also testified that on October 19, 2004, part of the discrepancy was that whoever discovered the discrepancy only queried the system for active voters, not the inactive voters. The person who did this query apparently did not understand the term "inactive voter" as distinguished from a "purged voter." Jeames testified that there were many idiosyncracies with the system that the technical personnel in the Secretary of State's Office may not have known, particularly when the queries may have required different programing codes to run a report. Nevertheless, the issues in the present case were largely resolved by making inquiries from individual registrars, rather than by programing technicalities.

[33] Transcript, Volume II, page 90.

possessed the general knowledge of specific county issues.  Tatum further

admitted that after she returned to her office, she knew that the 6 to 8 counties at

issue routinely sent in information directly, rather than uploading the data into

ALVIN.  Tatum acknowledged that the problem could have been that some

counties did not report inactives because the systems did not communicate well

enough to report inactives.  She also acknowledged that in the past, they had

repeated problems with St. Clair County on the question of whether the county had

accounted for all inactive voters in ALVIN.  No evidence exists that Tatum advised

Worley of these possible explanations.

        In the hearing, Tatum admitted that in the past, some problems arose in some

counties where local probate judges were reluctant to forego their local systems for

the ALVIN system.  Therefore, these counties, such as Morgan County, would

enter information into both the ALVIN system and a separate local county system.

She stated that Jefferson and Mobile Counties never came online with the State at

all.  Tatum also explained how some counties utilized software other than ALVIN,

such as Gemini, Syscon and others, which could pose potential compatibility

issues.   Prior to 1991 and the creation of ALVIN, Tatum simply took the data

provided by the county registrars and placed them on spreadsheets.  She ran these

numbers through IT personnel.  Thus, Tatum was familiar with how the county

registrars reported their information. In other words, Tatum was far from naive regarding the manner in which each county reported voter registration information. Although Tatum did not share in the responsibility for maintaining the voter registration numbers on the website, the website numbers were derived from the ALVIN data. Furthermore, although Tatum argued she never received training regarding how numbers were uploaded into the ALVIN system, she ignored her significant past experience and participation in developing the original parameters for the system and failed to account for the fact that she routinely answered questions posed by registrars when they received error reports or complained of problems incurred while trying to upload.

Moreover, Tatum admitted that October 19, 2004, was not the first time she knew about the discrepancies in voter registration numbers. A local reporter for the New York Times called Tatum directly sometime prior to October 19, 2004, and asked her about a discrepancy in the voter registration numbers.[34] Because Tatum was not allowed to talk to the press she referred the reporter to the Press Secretary, Wagnon.

When Tatum returned to Worley's office at about 5:00 p.m. on October 19, 2004, she presented the memorandum to Worley requesting additional time.

---

[34] Transcript, Volume II, pp. 235 - 236.

38

Granger testified that Tatum returned with no answers other than to say there was a computer problem and that she had been unable to reach Sheldon Jeames. Thus, Tatum failed to offer any other explanation regarding the efforts she made to answer the questions presented. Moreover, Tatum did not offer to discuss the historical problems in these counties which might provide some insight to explain the errors. According to Worley, the problem was not that Tatum could not provide a complete explanation, rather she offered no explanation at all. Although credible evidence suggests that Worley addressed Tatum in a demeaning manner at different points throughout the day, Tatum admitted she did not have a panic attack as a result of those actions.

As a result of Tatum's failure to offer any explanation, Worley then asked Tatum to move into Granger's office. There, Worley offered Tatum the choice of resigning or being placed on paid administrative leave pending disciplinary procedures which could lead to termination.[35] According to Granger, Tatum became upset and began asking questions about her retirement. Tatum requested assistance regarding the retirement issue. As a result, Linda Nelson, the Personnel Director for the Secretary of State, was called back to the office to advise Tatum regarding questions. Tatum stated that she trusted Nelson. According to Granger

---

[35] Testimony of Granger and Linda Nelson.

39

and Nelson, Tatum expressed more concern with her retirement than any other issue.[36] Nelson, a personal friend of Tatum, testified that prior to this event, Tatum had complained several times about the workload and had talked about leaving the office.

After discussing her questions with Nelson, Tatum resigned at approximately 5:50 p.m. Nelson testified that she witnessed Tatum voluntarily signing the document. Nelson stated that no one forced Tatum to sign. Nelson did not observe Tatum cry when it was signed. Nelson expressed her surprise that Tatum signed it because Nelson believed that the better course would have been to 'fight the dismissal. Worley accepted the resignation. Nelson made notes about the event in a tablet she kept at work.[37] Tatum then left the office and sought the assistance of legal counsel. Legal counsel advised Tatum to rescind her resignation, if possible. Tatum called back to the Secretary of State's Office where she spoke to Worley over the phone. Tatum asked to withdraw her resignation. However, Worley stated she had already accepted the resignation and she considered the matter closed.

Ultimately, the discrepancies were resolved by Cleckler and Granger. These

---

[36] Testimony of Granger and Linda Nelson.

[37] SOS Ex. 39.

40

individuals had no real experience with ALVIN or its programming. By directly

contacting the county registrars, they resolved these issues. In particular, Cleckler

and Granger determined that Mobile County had counted the white males twice and

that Shelby, St. Clair, Fayette and Tuscaloosa counties had not reported their

inactive voters. They further discovered that the Macon County discrepancy

resulted from a typographical error. While Bullock County had gained 70 voters, it

had also lost 110 registered voters.   Granger believed that Fayette County's

problems were also the result of the registrar misreporting white males.   The

matter was later resolved when Granger and Cleckler compared the two sets of

numbers, made several telephone calls and sent emails to the registrars in the eight

counties. Ultimately, however, the Secretary admits that the resolution of the issue

took about two weeks, primarily because neither Granger nor Cleckler possessed

Tatum's institutional knowledge or level of experience.[38]

### III. ISSUE

Did the Secretary of State provide a sufficient basis warranting her request

---

[38] Tatum admitted to being the Director of Voter Registration for approximately 15 ½ years and working in voter registration for 21 years. Sheldon Jeames testified at length regarding Tatum's involvement with developing the ALVIN system and that she routinely consulted with the registrars to determine that the information was correct and timely. Tatum performed these duties with every registrar throughout the state since the inception of ALVIN in 1991. While she had to trust that the registrars to enter accurate information, she also created the specifications and parameters which would permit ALVIN to obtain the correct information. Also, Tatum argued she had nothing to do with the ALVIN computers after her transfer to the Secretary of State's office. However, she admitted to working with Deanne Jeames in IT nearly every day.

41

for Tatum's

resignation for failure to maintain adequate voting records or was Tatum

discriminated against based upon a "mistake in fact"; that is, evidence which was

false, inaccurate, or based upon a false understanding of Tatum's duties?


## IV. DISCUSSION

**Standard of Review**

The Employee in this cause must demonstrate the alleged discrimination by a

"preponderance of the evidence."   The "preponderance" standard requires a

showing of a *probability* that the discrimination occurred.   Thus,  there must be

more than a mere possibility or one possibility among others that the facts support

the disciplinary action at issue. Rather, the evidence must establish that,  *more

probably than not,* the Employee was asked to resign based upon a discriminatory,

non-merit factor.

**Evidence appropriate for consideration in administrative hearings**

When considering the evidence, administrative agencies "are not restricted to

a consideration of evidence which would be legal in a court of law and may

consider evidence of probative force, even though it may be hearsay or otherwise

illegal." *Estates v. Bd. of Funeral Serv.,* 409 So. 2d 803, 804 (Ala. 1982). *See also*

42

*Alabama Bd. of Nursing v. Williams*, slip op. 2040082, note 1 (Ala. Civ. App.

March 24, 2006).   In particular, the State Personnel Boards Rules provide:

> In taking testimony and in considering the evidence, the
> Hearing Officer shall follow accepted legal procedure
> insofar as is practicable, but shall not be bound by the
> technical rules of evidence observed in courts of law.
> The Hearing Officer may listen to hearsay testimony and
> may accept depositions and affidavits if such testimony is
> material and relevant to the issues....[39]

---

[39] In *Smallwood v. DHR*, 716 So. 2d 684 (Ala. Civ. App. 1998) the Alabama Court of Civil Appeals noted that Section 41-22-13(1), a part of the Alabama Administrative Procedure Act ("AAPA") provides, in pertinent part, the following: "The rules of evidence as applied in nonjury civil cases in the circuit courts of this state shall be followed. When necessary to ascertain facts not reasonably susceptible of proof under those rules, evidence not admissible thereunder may be admitted (except where precluded by statute) *if it is of a type relied upon by reasonably prudent persons in the conduct of their affairs.....*" The *Smallwood* court explained "a civil litigant's due process right to cross-examine the witnesses against him is, however, not absolute. The United States Supreme Court has recognized that due process is not a rigid concept but one that must, of necessity, be determined by balancing the conflicting rights of the entities involved." *Stanley v. Illinois,* 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972).

In *Stanley,* the Court observed:"The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation and firmly establishes that what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." 405 U.S. at 650-51 [92 S. Ct. 1208]. The "government function involved" may be examined. For example, with the Department of Human Resources the State has a vital interest in the safety of all children, and it is rightly concerned with the well-being of those children in the daycare centers it licenses. Because child abuse almost always occurs in secrecy, with the child being the only witness, and it is, therefore, difficult to prove, *see* Note, *A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases,* 83 Colum. L. Rev. 1745 (1983), the State's interest dictates that DHR should be allowed to rely on some hearsay in a child abuse hearing. *See generally Waters v. Churchill,* 511 U.S. 661, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (1994) (agencies can base findings of fact on evidence that is reasonably reliable, even if that evidence would not be admissible in a jury trial).

However, the Alabama Supreme Court cautioned in *Ex Parte Williamson,* 907 So. 2d 407 (2005) that "while the Administrative Procedure Act does relax the rules of evidence, it does not relax the rules to the point of allowing 'DOUBLE HEARSAY' to be considered."   (Relying upon *Screws v. Ballard,* 574 So. 2d 827, 829 (Ala. Civ. App. 1990). Further, Alabama Courts have instructed although hearsay is admissible in an administrative proceeding, it cannot provide the sole basis for an administrative ruling. See *State Personnel Board v. State Dept. of Mental Health and Mental Retardation,* 694 So. 2d 1367 (Ala. Civ. App. 1996); *Kid's Stuff Learning Center, Inc. v. State Dept. of Human Resources,* 660 So.2d 613 (Ala. Civ. App.1995); *Edmondson v. Tuscaloosa County,* 48 Ala. App. 372, 265 So.2d 154 (1972). *Duncan v. State Dept. of Human Resources,* 627 So. 2d 427 (Ala. Civ. App. 1993). *See also* Ala. Code 1975, § 41-22-13; hearsay evidence of probative force may be considered in an administrative hearing. *Estes v. Bd. of Funeral Serv.,* 409 So.2d 803 (Ala.1982). "Nonetheless, there must be sufficient legal evidence to support the order of an administrative board. If founded *only* on hearsay or other improper evidence, the decision of a board cannot be sustained." *Estes* at 804. (Emphasis in original.)

43

*see also* Ala. Code 1975, § 41-22-13(1) (allowing admission in administrative

hearings of evidence "of a type commonly relied upon by reasonably prudent

persons in the conduct of their affairs," even if such evidence would be

inadmissible in judicial proceedings). Administrative agencies must act within

their constitutional or statutory powers, supporting their decisions with substantial

evidence. *Little Caesar's, Inc. v. Alabama Alcoholic Beverage Control Bd.,* 386

So. 2d 224 (Ala. Civ. App. 1979).

**Tatum's claim for Discrimination as a result of an unlawful "non-merit**

**factor"**

The Secretary in this case demonstrated legitimate business reasons for the

actions taken. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th

Cir.1997). Thus, the Employee must present "significantly probative evidence

showing that the asserted reason is merely a pretext for discrimination." *Brooks v.*

*County Comm'n*, 446 F.3d 1160, 1163 (11th Cir.2006). Stated differently, Tatum

must demonstrate "such weaknesses, implausibilities, inconsistencies,

incoherencies or contradictions in the employer's proffered legitimate reasons for

its actions that a reasonable fact finder could find them unworthy of credence."

*Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir.2005) (citation and

quotation marks omitted). Where multiple reasons are advanced, an appealing

44

employee must show that each reason was a pretext. *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir.2000) *(en banc)*. Moreover, "[a] reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" *Brooks*, 446 F.3d at 1163.

The resolution of this action hinges upon whether Tatum not only plead, but also proved, the elements of her claim for discrimination.

The primary issue in this cause concerns whether Tatum's resignation resulted from unlawful, non-merit factor discriminatory conduct.[40] In other words, in this particular case, non-merit factor discrimination requires a showing of

- An adverse personnel action

- which resulted in

- separation or demotion

- based upon a statutorily prohibited or non-merit factor form of discrimination.

In this case, Tatum must demonstrate that she was given the choice to resign

---

[40] Counsel for Tatum spends portions of the final brief arguing Tatum was the victim of political discrimination, a claim which was dismissed at the onset of this appeal in March, 2005. The claim was dismissed as a matter of law for failure to merely plead the basic elements of a claim. The Employee attempted to allege a new basis for the claim at the hearing--that she lobbied adversely to Worley regarding the consolidation of the Voter's Registration Office and the Secretary of State's Office. The Employee made no effort to plead these facts or issues for more than a year and never mentioned them when directly given four separate opportunities to allege a claim for political discrimination. The parties were carefully advised that failure to timely object or plead a position results in waiver. The Employee was prohibited from raising a new basis for a claim for political discrimination after her counsel took months to simply define the issue for hearing. Thus, the Employee waived the right to assert new claims and issues at the hearing, particularly when the facts which make the basis of this new allegation occurred in 2003.

45

based upon facts which later proved to be false.

This particular factual allegation presents a case of first impression under the discrimination provision of the *Alabama Administrative Code*.

## A. Did Tatum prove the existence of "an adverse personnel action"?

Tatum argued that her resignation was not voluntary, but rather the result of discriminatory coercion and duress. However, Alabama law holds that when an employee has been given the choice between resignation and facing dismissal proceedings, duress and coercion are absent as a matter of law. *Atkins v. Birmingham City Bd. of Educ.*, 480 So. 2d 585 (Ala. Civ. App.1985); *Van Arsdel v. Texas A & M University*, 628 F. 3d 344 (5th Cir. 1980).[41] In a similar action, one Federal court held as a matter of law that employee resignations are presumed to be voluntary. The presumption will prevail unless the plaintiff comes forward with sufficient evidence to establish that the resignation was involuntarily extracted. "Duress is not measured by the employee's subjective evaluation of the situation. Rather the test is an objective one." *Christie v. U.S.*, 518 F.2d 584, 587 (U.S.

---

[41] Similarly, Worley refers to a similar action wherein an employee sought reinstatement and back pay after she resigned. In that case, an employee of the Federal government had been told that she would be dismissed following a confrontation with her supervisor. The employee denied the charges. The employee subsequently received an offer to resign due to an agency reduction in force. The employee resigned, stating that the resignation was "conditioned on her allegation that it was being tendered under duress and involuntary." The employee appealed and the court held that employee resignations are presumed to be voluntary unless the employee produces sufficient evidence to establish the resignation was involuntarily extracted. The court held that the employee's resignation was involuntary. *Christie v U.S.*, 518 F. 2d 584 (U.S. Claims Ct. 1975).

46

Claims Ct. 1975).[42]  The *Christie* court went further to hold that even when the

employee's choices are between resignation and dismissal, the fact remains that the

employee has a choice.

The Secretary responds that Tatum failed to prove that her resignation

resulted from an adverse personnel action, but rather resulted from her own

voluntary act.  The Secretary states that no adverse  personnel action was taken.

Rather, Tatum elected to resign in light of the knowledge that if she remained,

Worley intended to move forward with dismissal proceedings and placing Tatum

on mandatory leave pending the outcome.[43]  Therefore, the Secretary argues since

Tatum voluntarily resigned her position from the Department, "no adverse

employment action" was proven.  In turn, Tatum argues her resignation was not

"voluntary."

Generally, well-settled law holds that  "an adverse employment action" by

definition, is an employment decision made by an employer that "deprives [a

person] of employment opportunities." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571,

590 (11th Cir.2000).     What constitutes an adverse employment action must be

---

[42] In the present action, Tatum and two other employees stated they did not believe Tatum had any other choice but to resign. On the other hand, Nelson testified that had she been presented with the same option, she would have not resigned but taken the mandatory leave. While neither subjective opinion of these witnesses is relevant, the primary question presented is whether the reasonable person would have resigned under the circumstances.

[43] Secretary's brief at page 5.

analyzed in light of whether the allegedly discriminatory conduct "was so intolerable that a reasonable person in [her] position would be compelled to resign." *Beard v. 84 Lumber Co*, slip op., 2006 WL 2946883, C.A.11 (Ala.), October 17, 2006; *Morgan v. Ford*, 6 F.3d 750, 755-56 (11th Cir.1993) (citations omitted), *cert. denied*, 512 U.S. 1221 (1994); *see also Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir.1991).[44]   The law is also well settled that in assessing the circumstances, the court must not rely solely upon an employee's subjective feelings about her employer's actions, rather, the test is whether a reasonable person in the employee's position would be compelled to resign. *Doe v. DeKalb County Sch. Dist.*, 145 F.3d 1441, 1450 (11th Cir.1998).

The law also holds that in similar cases where an employee alleges some form of discrimination, that an adverse action does not result from a resignation unless the reasonable employee would have considered the conditions of work so intolerable that he or she was involuntarily forced to resign. *See Washington v. Kroger Co.*, slip op. no. 2007 WL 433519 (11th Cir., Feb. 8, 2007); *Hipp v. Liberty National Life Ins. Co.*, 252 F. 3d 1208 (11th Cir. 2001).  In *Hipp*, the court held after a thorough review of the extensive record created,  that no reasonable person

---

[44] Although the present case is not a constructive discharge case, these cases do provide persuasive guidance.

48

in the employees' positions would have felt compelled to resign (*citing Wardwell*,

786 F.2d at 1557) where:

> "**At most, Plaintiffs have proven that King [the employer] had a harsh, confrontational, and perhaps even at times offensive style of management, and the company was changing some of its policies regarding the manner in which it conducted its business.** While King's management style may or may not have been effective, and the changes in Liberty National's business practices may or may not have been wise, it is not our place to tell employers how to run their businesses. *See Chapman v. AI Transport*, 229 F.3d 1012, 1031 (11th Cir.2000) (en banc). Plaintiffs have not proven that age-based harassment caused their working environments to become so objectively intolerable that they had no choice but to resign. Since Plaintiffs have not shown that they were subjected to adverse employment actions, the district court should have granted judgment as a matter of law to Liberty National on Plaintiffs' claims, and its judgment in favor of Plaintiffs must be reversed.

252 F.3d 1244-1245.

Specifically, the court in *Christie, supra*, stated:

> While it is possible the plaintiff, herself, perceived no viable alternative but to tender her resignation, the record evidence supports DSD's finding that the plaintiff chose to resign and accepted discontinued service retirement, rather than challenge the validity of her proposed discharge for cause. The fact remains, the plaintiff had a choice. She could stand put and fight. She chose not to. Merely because the plaintiff was faced with an inherently unpleasant situation in that her choice was arguably limited to two unpleasant alternatives does not obviate the voluntariness of her resignation.

*Id.* at 587.

In the present case, when Tatum signed and submitted her resignation, she was not

screaming or crying or under duress. The testimony also supported the finding that although Worley was firm, perhaps even rude, she was not yelling or screaming. Moreover, the evidence supported the finding that Tatum's primary concerns centered upon her retirement benefits rather than the issues giving rise to the resignation. Worley provided Tatum an opportunity to discuss her retirement benefits with Nelson, her friend, before making a final decision at approximately 5:50 p.m., nearly an hour after Worley presented the choice between resignation and dismissal proceedings. Nelson also testified that Tatum's resignation was voluntary and that no one forced Tatum to sign it. Moreover, the evidence establishes that Worley's ultimatum was based not on the fact that Tatum failed to provide a complete explanation, but rather, on the fact that Tatum failed to offer *any* explanation for the discrepancies (partial or complete) despite the fact that she was aware of several possibilities for the error.

Additionally, Tatum was a management level employee, a previous supervisor, with over 15 years of experience in the state merit system. As a former supervisor, she was fully aware, or should have been aware, of her appeal rights in dismissal actions. While the undersigned neither approves nor condones Worley's management style, nor her behavior towards Tatum, the evidence is equally clear that Tatum did little to foster a cohesive relationship with Worley's administration.

50

Moreover, Tatum made little more than a half-hearted attempt to promptly address Worley's questions.

Accordingly, the undersigned finds as a matter of law that Tatum has failed to prove that her resignation was anything other than a voluntary election. Thus, where the employee's loss of position results from her only voluntary act, no "adverse employment action" exits as a matter of law. *See also Whittaker v. Northern Illinois Univer.*, 424 F. 3d 640 (7th Cir. 2005)(where the employee voluntarily left the job prior to the implementation of disciplinary action, she did not demonstrate an adverse employment action).

Even assuming arguendo that Tatum established that adverse personnel actions existed, her claims would nevertheless fail as a matter of law.

**B. The Secretary's Acts Did Not Constitute an Unlawful Form of Non-Merit Factor Discrimination.**

In particular, the primary question initially presented in this case was whether Tatum resigned due to a representation of facts which later proved to be false. The undersigned originally permitted this appeal to determine if the basis of her resignation resulted from facts which later proved to be factually false, or if her employer had demanded performance regarding matters unreasonably beyond the scope of her assigned job duties. More specifically, Tatum originally plead that she

51

resigned because she had been accused of failing to properly maintain the Secretary of State's database concerning the number of registered voters. Tatum also alleged that when she could not readily explain the discrepancy, she was given the options of termination or resignation. Tatum then contended that within hours of her resignation, it was determined that, in fact, no error existed in the number of registered voters. In other words, Tatum contends that she based her resignation upon facts represented by her supervisor which later proved to be untrue. However, the evidence failed to support Tatum's position. Unquestionably, errors exist in the voter registration numbers. These voter registration records were not accurate on October 19th. These inaccuracies were eventually corrected by other employees.

Next, Tatum failed to show that her resignation resulted from Worley's false understanding of Tatum's duties. Tatum contended that she was not familiar with how the voter registration numbers were uploaded, thus the answers to Worley's questions could not have occurred without technical computer programming assistance. Tatum also claimed to not possess the knowledge to be able to address the problem. However, the evidence demonstrated that Tatum was instrumental in designing the parameters for ALVIN and acted as a liaison with the county registrars to develop this statewide system beginning in 1991. Tatum continued to

work with the system and county registrars throughout her tenure as the Director of

Voter Registration and in the Secretary of State's Office. Sheldon Jeames testified

that as they designed ALVIN, Tatum "explained things like how active and

inactive voters should be processed." As the program developed, Tatum was aware

of various reporting problems that each of the counties encountered, particularly

those counties which maintained dual systems and those which did not directly

upload their information into the ALVIN database.

Moreover, Worley's actions were motivated not because Tatum failed to

provide a complete explanation, but rather, the fact that Tatum offered no

explanation. Given Tatum's long history with the development of ALVIN, she

could have made more than a half hearted attempt to contact each registrar or even

offered theories about the counties at issue based upon historical problems with

uploading date in these counties.

Tatum attempted to argue that a mistake in fact existed regarding her

assigned duties. While the undersigned does not condone Worley's recalcitrant

attitude toward performance appraisals or the apparent lack of communication

skills regarding her employees, Tatum's job responsibilities were spelled out both

in the Alabama Code and on previous performance appraisals. The evidence

supported the conclusion that Tatum continued to maintain close, daily contact

53

with Deanne Jeames regarding the ALVIN data. Tatum also talked with various county registrars on a daily basis concerning voter registration matters. While Tatum may have been unclear on some of her job responsibilities, responsibility for the accuracy of ALVIN's voter registration data was not a subject which required clarification.

Accordingly, the undersigned finds the totality of the evidence fails to support Tatum's contention that her resignation was tendered only based upon facts which later proved to be false, inaccurate, or so unreasonably beyond a mistaken understanding regarding the scope of her duties.

The evidence demonstrates that Tatum's statutory responsibilities with regard to the maintenance of the voter registration data remained consistent both before and after the 2003 legislation. Tatum was an integral part of developing the parameters of the ALVIN system. Sheldon Jeames testified that Tatum constantly instructed and trained county registrars how to enter data into the system. Tatum testified that since the early 1990's she received monthly reports from the counties. Even when Tatum transferred to the Secretary of State's Office, she continued to work with Deanne Jeames in the IT division regarding the ALVIN data. In a memorandum to Robert White in July 2004, Tatum reported "I, as always, work with Deanne on the ALVIN system and talked to many of the counties on their

systems matching up with ALVIN... I have, as I do every month, collect the totals of registered voters from the counties."

Moreover, while Tatum contends that the issue could not have been resolved without IT intervention, the overwhelming weight of the evidence demonstrates that Tatum could have made a few detailed telephone calls and, based upon her institutional knowledge, she was fully capable of offering at least a partial explanation regarding the discrepancies. She could have made a more sincere effort to reach the additional counties which traditionally encountered issues regarding the submission of their inactive voters. In sum, Tatum's inability to produce an explanation was not due to a mistaken set of facts nor a misunderstanding of her duties, but rather to Tatum's lack of diligence and resourcefulness.

Therefore, because Tatum has failed to demonstrate some unlawful non-merit factor of discrimination, no other factual or legal basis exists for this appeal. Thus, the undersigned recommends that this APPEAL be DISMISSED WITH PREJUDICE.

55

Done, this the 20th day of March, 2007.

*Julia J. Weller*

JULIA JORDAN WELLER
Administrative Law Judge
State of Alabama
Personnel Department
64 North Union Street
Montgomery, Alabama 36130
(334) 242-3451
(334) 353-4481


## VIA FACSIMILE AND UNITED STATES MAIL

Norbert Williams, Esq.
Alabama State Employees Association
110 North Jackson Street
Montgomery, AL  36104
FAX: 832-1074

John Bolton, Esq.
Charlanna W. Spencer, Esq.
Sasser, Bolton, Stidham & Sefton, P.C.
Post Office Box 242127
Montgomery, AL  36124-2127
FAX: 532-3434

EXHIBIT "B"

# BEFORE THE PERSONNEL BOARD OF THE STATE OF ALABAMA

## IN THE MATTER OF
## THE APPEAL OF ANITA TATUM

## NOTICE OF APPEAL TO THE CIRCUIT COURT OF
## MONTGOMERY COUNTY, ALABAMA

Comes now the appellant, Anita Tatum (Tatum), by and through her attorney, Norbert H. Williams, and pursuant to <u>Alabama Code</u> §41-22-20 (1975), gives notice of appeal to the Circuit Court of Montgomery County, Alabama from this Board's order which dismissed her appeal with prejudice. This Board entered the Order of Dismissal on April 18, 2007.

Respectfully submitted this the 18<u>th</u> day of May 2007.

NORBERT H. WILLIAMS (WIL176)
ATTORNEY FOR ANITA TATUM

## CERTIFICATE OF SERVICE

I hereby certify that on this $\underline{18^{th}}$ day of May 2007, I did serve a copy of the foregoing document on the foregoing via facsimile or by placing the same in the United States Mail, first class postage prepaid and addressed as follows:

The Honorable Alice Ann Byrne
General Counsel
Alabama State Personnel Department
300 Folsom Administrative Building
Montgomery, Alabama 36130-4100
Facsimile Number: (334) 242-1110

The Honorable John Bolton
Sasser, Bolton, Stidham & Sefton, P.C.
P.O. Box 242127
Montgomery, AL 36124-2127
Facsimile Number: (334) 532-3434

The Honorable Debra Williams Brown
General Counsel
Alabama Secretary of State
P.O. Box 5616
Montgomery, Alabama 36103-5616
Facsimile Number: 334-353-7344

NORBERT H. WILLIAMS (WIL176)

**ADDRESS OF COUNSEL:**

Alabama State Employees Association
110 North Jackson Street
Montgomery, AL 36104
(334) 834-6965
(334) 832-1074 FAX

2

**BEFORE THE PERSONNEL BOARD OF THE STATE OF ALABAMA**

**IN THE MATTER OF
THE APPEAL OF ANITA TATUM**

## SECURITY FOR COSTS

We hereby acknowledge ourselves as security for costs of appeal.  For the payment of all costs secured by this undertaking, we hereby waive our right of exemption as to personal property under the Constitution and laws of the State of Alabama.

Executed with our seals this the <u>18th</u> day of May 2007.

BY: _____

NORBERT H. WILLIAMS (WIL 176)
ATTORNEY FOR ANITA TATUM

_____
LISA SMOKE (AS SURETY)

_____
JUDY GUESS (AS SURETY)

Filed this the <u>18th</u> day of May 2007.

**ADDRESS OF COUNSEL:**

Alabama State Employees Association
110 North Jackson Street
Montgomery, AL 36104
(334) 834-6965
(334) 832-1074 FAX